UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

OLIVER ELOY MATA VELASQUEZ,

    Petitioner,

  v.

STEPHEN KURZDORFER et al.,

    Respondents.

25-CV-493-LJV
DECISION & ORDER

---

Oliver Eloy Mata Velasquez followed all the rules.  He did not sneak into the country; instead, he came here under a United States Department of Homeland Security ("DHS") program for individuals like him—those fleeing Venezuela.  He traveled here at his own expense.

When he arrived in the United States, DHS told him that he could remain here on parole for two years; in fact, the government gave him a work authorization and assigned him a social security number.  And since his arrival almost a year ago, Mata Velasquez has done everything asked of him.  He appeared for every appointment and court date.  He committed no crimes.  He did what he was supposed to do.

But when Mata Velasquez came to court for a scheduled appearance in his asylum case in May of this year, he was arrested by United States Immigration and Customs Enforcement ("ICE").  He has been detained since.  Nineteen years old with no criminal history and in prison for the first time, he is scared.  Even worse, he reports being harassed so badly by other detainees that officers have threatened to place him in solitary confinement.

It is not for this Court to decide whether the prior administration made the correct decision in instituting the parole program through which Mata Velasquez was invited and came to this country.  Nor is it for this Court to decide whether the current administration is making the right policy choice in terminating that program.  The narrow—but weighty—question before the Court is this: what process is Mata Velasquez due before DHS can do an about-face, terminate his parole, and keep him in custody pending his deportation?

The answer to that question is far from easy.  It involves walking a tightrope.  On one side is this Court's crucial role as a check on the executive branch.  On the other, and equally important, is this Court's obligation to stay within the bounds of its jurisdiction and not exceed its authority.

After careful consideration, this Court finds that Mata Velasquez is likely to succeed on his argument that his detention is unlawful and violates his right to procedural due process.  And because this Court also finds that [Mata Velasquez's] detention is causing him irreparable harm and that the balance of the equities tips decidedly in his favor, the Court grants his motion for a preliminary injunction.  Docket Item 22.  This Court therefore orders that Mata Velasquez must be released and may not be re-detained without leave of Court, which this Court will not grant unless and until the government[1] demonstrates that Mata Velasquez has received a meaningful opportunity to be heard.

---

[1] For ease of reference, this Court will refer to the respondents—Stephen Kurzdorfer, in his official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, ICE; Joseph Freden, in his official capacity as Deputy Field Office Director of the Buffalo Federal Detention Facility; Todd Lyons, in his official capacity as Acting Director of ICE; Kristi Noem, in her official capacity as U.S.

## BACKGROUND

### I.    2022 DHS PAROLE PROGRAM FOR VENEZUELANS

In 2022, DHS instituted a program for Venezuelans that "coupl[ed] a meaningful incentive to seek a lawful, safe[,] and orderly means of traveling to the United States with the imposition of consequences for those who s[ought] to enter irregularly." *Doe v. Noem*, --- F. Supp. 3d ---, 2025 WL 1099602, at *1 (D. Mass. Apr. 14, 2025) (quoting Implementation of a Parole Process for Venezuelans ("Parole Implementation"), 87 Fed. Reg. 63507 (Oct. 19, 2022)). "Under the program, individuals who passed a national security and public safety vetting and who had a supporter in the United States who agreed to provide housing and other support could receive an advanced authorization to travel to the United States for the purposes of seeking, on a case-by-case basis, a discretionary grant of parole at an internal port of entry." *Id.* (citing Parole Implementation, 87 Fed. Reg. at 63515). "The program specified that discretionary grants of parole would be for a temporary period of up to two years, during which time individuals could seek humanitarian relief or other benefits and receive work authorization." *Id.* (citing Parole Implementation, 87 Fed. Reg. at 63508). It further provided "that those 'who [we]re not granted asylum or other immigration benefits w[ould] need to leave the United States at the expiration of their authorized period of parole or w[ould] generally be placed in removal proceedings after the period of parole expire[d].'" *Id.* (quoting Parole Implementation, 87 Fed. Reg. at 63508). The program

---

Secretary of Homeland Security; Pamela Bondi, in her official capacity as Attorney General of the U.S.; Sirce E. Owen, in her official capacity as Acting Director of the Executive Office for Immigration Review ("EOIR"); DHS; ICE; U.S. Department of Justice; and EOIR—as "the government" throughout this opinion.

"was capped at 24,000 beneficiaries."  *Id.* (citing Parole Implementation, 87 Fed. Reg. at

63508).

## II.    2025 FEDERAL REGISTER NOTICE OF TERMINATION

On March 25, 2025, DHS issued a notice in the Federal Register that it was

terminating parole for anyone admitted through the parole program for Venezuelans, or

the similar parole programs for Cubans, Haitians, and Nicaraguans (collectively the

"CHNV parole programs").  *See* Termination of Parole Processes for Cubans, Haitians,

Nicaraguans, and Venezuelans ("Termination Notice"), 90 FR 13611-01, 2025 WL

894696 (Mar. 25, 2025).  Among other things, the notice stated that

> DHS has determined that it is now appropriate and necessary to terminate
> the CHNV parole programs.  These programs do not serve a significant
> public benefit, are not necessary to reduce levels of illegal immigration, did
> not sufficiently mitigate the domestic effects of illegal immigration, are not
> serving their intended purposes, and are inconsistent with the
> Administration's foreign policy goals.  Regarding previous arguments or
> determinations that these programs were consistent with the requirement
> of "urgent humanitarian reasons" for granting parole, DHS believes that
> consideration of any urgent humanitarian reasons for granting parole is best
> addressed on a case-by-case basis consistent with the statute, and taking
> into consideration each [noncitizen]'s specific circumstances.  These
> reasons, independently and cumulatively, support termination of the CHNV
> parole programs.
>
> Accordingly, the Secretary, in her discretion, is terminating the CHNV parole
> programs.  Consistent with her statutory authority, the Secretary retains
> discretion to continue to extend parole to any [noncitizen] paroled under
> CHNV—temporarily under such conditions as she may prescribe only on a
> case-by-case basis for urgent humanitarian reasons or significant public
> benefit.  *See* INA [§] 212(d)(5)(A), 8 U.S.C. [§] 1182(d)(5)(A).  The decision
> to do so, or not do so, is committed to the Secretary's sole discretion.

*Id.* at 13612 (italics added) (footnote omitted).[2]

---

[2] The legality of this notice is being litigated.  On April 15, 2025, a district court in
the District of Massachusetts entered an emergency preliminary injunction staying the
notice.  *See Doe*, 2025 WL 1099602, at *20 (staying the Termination Notice "pending

### III.    MATA VELASQUEZ

Mata Velasquez "came to the United States to seek safety." Docket Item 21 at ¶ 39. More specifically, under the 2022 parole program, he "applied to enter the United States" from Venezuela "through [DHS's] CBPOne application and received an appointment to come to the United States to present his application for asylum." *Id.* at ¶ 39. He traveled here at his own cost, arriving on September 13, 2024. *Id.* at ¶ 40.

Upon his arrival, Mata Velasquez was given a notice to appear ("NTA") on May 21, 2025. *Id.* In the meantime, he was granted discretionary humanitarian parole for two years to pursue his asylum claim. *Id.* He subsequently applied for and received employment authorization and a social security number. *Id.* at ¶ 41.

As explained above, on March 25, 2025, DHS published a notice that it was terminating the parole programs that have been in place for individuals from Cuba, Haiti, Nicaragua, and Venezuela. *See id.* at ¶ 42. On May 21, Mata Velasquez appeared in immigration court as ordered. *Id.* at ¶ 43. The immigration judge ("IJ") adjourned his case until February 4, 2026, so that Mata Velasquez could obtain legal counsel and prepare to file an asylum application. *Id.* All seemed to be going as had been promised

---

further court order insofar as it revokes, without case-by-case review, the previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to [the CHNV parole programs] prior to the noncitizen's originally stated parole end date"). That decision is currently on appeal before the First Circuit. In the meantime, however, the Supreme Court stayed the injunction without a written opinion explaining its reasoning. *See Noem v. Doe*, 145 S. Ct. 1524 (2025) ("The application for stay . . . is granted. The April 15, 2025[,] order entered by the United States District Court for the District of Massachusetts, case No. 1:25-cv-10495, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.").

and as Mata Velasquez planned.  But he then was arrested at the courthouse.  *Id.* at ¶ 44.

Now in immigration custody, Mata Velasquez "is terrified and experiencing the harms of being in a carceral setting for the first time."  *Id.* at ¶ 46.  "He has experienced harassment from at least [ten] other detainees, many of whom are much older than him."  *Id.*  "Officers threatened to place him in solitary confinement, and [he] is very scared of being put in such isolating conditions."  *Id.*  He also "fears physical harm from his harassers."  *Id.*  He is "suffer[ing] stress and anxiety in detention and was given medication to try to relax him, but the medication has not been working."  *Id.*

On May 28, 2025, a week after his arrest, ICE "issued a letter in English only—even though [Mata Velasquez] only reads in Spanish—that terminated his parole pending the outcome of his removal proceedings."  *Id.* at ¶ 47.  The letter stated: "On September 13, 2024, U.S. Customs and Border Protection (CBP) granted you a discretionary humanitarian parole into the United States.  [DHS] has revoked your parole and taken you back into custody pending the outcome of removal proceedings."  Docket Item 62-1 at 5.[3]  It did not provide any further explanation for DHS's decision.  *See id.*

That same day, DHS moved to dismiss the 8 U.S.C. § 1229a removal proceedings against Mata Velasquez.  Docket Item 21 at ¶ 48.  More specifically, DHS stated that it had "reviewed the facts and circumstances of the case and determined that circumstances after [the] issuance of the [NTA] have changed to such an extent that continuation is no longer in the best interest of the government."  *Id.*  The IJ granted

---

[3] Page numbers in docket citations refer to ECF pagination.

that motion on June 6, and Mata Velasquez appealed to the Board of Immigration Appeals ("BIA"). *Id.* at ¶ 51.

"On June 10, 2025—despite [Mata Velasquez]'s pending appeal of the dismissal of his removal proceedings and without notifying [his] counsel—the government initiated expedited removal proceedings against [him] pursuant to § 1225(b)(1)." *Id.* at ¶ 52. He appeared for a bond hearing on June 11, but the IJ held that Mata Velazquez was ineligible for bond because section 1225(b) mandates detention. *Id.* at ¶ 53. ICE then referred Mata Velazquez to a credible fear interview ("CFI"). *Id.*

A short time later, Mata Velasquez moved for a temporary restraining order ("TRO") to stop the expedited removal process, Docket Item 43, but he withdrew his TRO request after the parties reached a stipulation, Docket Item 51 at ¶ 13. Among other things, the stipulation provided that United States Citizenship and Immigration Services ("USCIS") had determined that it did not have jurisdiction to conduct the CFI under the expedited removal process while Mata Velazquez's appeal to the BIA is pending. *Id.* at ¶ 10. The parties further agreed that

> [i]n the event that USCIS determines at a later date that it has jurisdiction to conduct a CFI while [Mata Velasquez]'s [s]ection 1229a proceedings remain pending, including while on appeal at the BIA, and if ICE then chooses to request that USCIS conduct a CFI in the future, it will do so only after having given [Mata Velasquez]'s counsel [seven] days' notice of such intent.

*Id.* at ¶ 11.

## LEGAL PRINCIPLES

### I.    PRELIMINARY INJUNCTION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party to the suit, [the court's] inquiries into the public interest and the balance of the equities merge."  *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24.  In fact, preliminary injunctions "should not be routinely granted." *Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (quoting *Med. Soc. of State of N.Y. v. Toia*, 560 F.2d 535, 537 (2d Cir. 1977)).  And "[w]hen deciding whether to issue a preliminary injunction, courts 'should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  *We The Patriots USA, Inc.*, 17 F.4th at 279 (quoting *Winter*, 555 U.S. at 24).

### II.    SECTION 2241 PETITION

28 U.S.C. § 2241 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)).  "When a petitioner brings a habeas petition [under section] 2241, the petitioner 'bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden

of proof by a preponderance of the evidence.'"  *Dzhabrailov v. Decker*, 2020 WL

2731966, at *3 (S.D.N.Y. May 26, 2020) (quoting *Skaftouros v. United States*, 667 F.3d

144, 158 (2d Cir. 2011)).  "The equitable principles governing [section] 2241 are

reflected in the plenary discretion vested in habeas courts to 'hear and determine the

facts, and dispose of the matter as law and justice require.'"  *Id.* (alterations omitted)

(quoting *Pinkney v. Keane*, 920 F.2d 1090, 1093 (2d Cir. 1990)).

## DISCUSSION

## I.    STATUTORY AND REGULATORY CONTEXT

Under 8 U.S.C. § 1225, a noncitizen "who 'arrives in the United States,' or 'is

present' in this country but 'has not been admitted,' is treated as 'an applicant for

admission.'"  *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018) (quoting 8 U.S.C.

§ 1225(a)(1)).  "Section 1225(b)(1) applies to [noncitizens] initially determined to be

inadmissible due to fraud, misrepresentation, or lack of valid documentation," as well as

"to certain other [noncitizens] designated by the Attorney General in h[er] discretion."

*Id.* (citing 8 U.S.C. § 1225(b)(1)).

Noncitizens "covered by [section] 1225(b)(1) are normally ordered removed

'without further hearing or review' pursuant to an expedited removal process."  *Id.* (citing

8 U.S.C. § 1225(b)(1)(A)(i)).  But if a noncitizen covered by section 1225(b)(1)

"'indicates either an intention to apply for asylum . . .  or a fear of persecution,' then that

[person] is referred for an asylum interview."  *Id.* (quoting 8 U.S.C. § 1225(b)(1)(A)(ii)).

The noncitizen "shall be detained pending a final determination of credible fear of

persecution and, if found not to have such a fear, until removed."  8 U.S.C.

§ 1225(b)(1)(B)(iii)(IV).  And "[i]f an immigration officer determines after that interview

that the [noncitizen] has a credible fear of persecution, 'the [noncitizen] shall be detained for further consideration of the application for asylum'" under section 240 of the Immigration and Nationality Act ("INA").  *Jennings*, 583 U.S. at 286 (quoting 8 U.S.C. § 1225(b)(1)(B)(ii)).

Alternatively, DHS can forgo the expedited removal process and refer an applicant for admission to removal proceedings under section 240 of the INA, 8 U.S.C. § 1229a.  *See* 8 U.S.C. § 1225(b)(2).  Under 8 U.S.C. § 1229a, a noncitizen in section 240 proceedings has "the privilege of being represented . . . by counsel of the [noncitizen]'s choosing who is authorized to practice in such proceedings" and "a reasonable opportunity to examine the evidence against the [noncitizen], to present evidence on the [noncitizen]'s own behalf, and to cross-examine witnesses presented by the [g]overnment."  8 U.S.C. § 1229a(b)(4).  Under 8 C.F.R. § 1003.38(a), decisions made by IJs "may be appealed to the [BIA]."  And under 8 U.S.C. § 1252(b)(2), final orders of removal may be appealed to the United States Court of Appeals for the judicial circuit in which the final order was entered.  Like section 1225(b)(1), section 1225(b)(2) mandates detention.  *See* 8 U.S.C. § 1225(b)(2)(A) (stating that the noncitizen "shall be detained for a proceeding under section 1229").

The only exception to the mandatory detention required by section 1225 is that "applicants for admission may be temporarily released on parole 'for urgent humanitarian reasons or significant public benefit.'"  *Jennings*, 583 U.S. at 288 (quoting 8 U.S.C. § 1182(d)(5)(A)).  "Such parole, however, 'shall not be regarded as an admission of the [noncitizen].'"  *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)).

DHS can terminate parole "upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of [certain specified DHS] officials . . . , neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States."  8 C.F.R. § 212.5(e)(2)(i).  DHS must provide "written notice to the [noncitizen] and he or she shall be restored to the status that he or she had at the time of parole."  *Id.*; *see also* 8 U.S.C. § 1182(d)(5)(A) (explaining that "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served[,] the [noncitizen] shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States").  "Any further inspection or hearing shall be conducted under section 235 [8 U.S.C. § 1225] or 240 [8 U.S.C. § 1229] of the [INA] and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed."  8 C.F.R. § 212.5(e)(2)(i).  "If the exclusion, deportation, or removal order cannot be executed within a reasonable time," however, the noncitizen "shall again be released on parole unless in the opinion of the official listed in paragraph (a) of this section the public interest requires that the [noncitizen] be continued in custody."  *Id.*

## II.    THIS COURT'S JURISDICTION

### A.    Section 1252(g)

The government argues that "[t]his Court lacks jurisdiction to hear challenges to certain executive actions taken in the immigration context, including the initiation of removal proceedings," and that Mata Velasquez's claims therefore "should be denied at the outset."  Docket Item 42 at 8.  More specifically, the government observes that 8

U.S.C. § 1252(g) withholds jurisdiction from district courts over "any cause or claim by or on behalf of any [noncitizen] arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any [noncitizen] under this chapter." *Id.* (quoting 8 U.S.C. § 1252(g)).  Thus, the government argues, this Court has no jurisdiction to review the government's decision to commence expedited removal proceedings against Mata Velasquez.  *Id.* at 9.

This Court agrees that it lacks jurisdiction to review the government's discretionary decisions to initiate removal proceedings.  In other words, this Court does not have the power to second-guess the wisdom of the executive branch's exercise of its discretion.  But district "[c]ourts can review 'how' [the respondents] exercise their discretion because such a claim does not ask 'why the Secretary chose to execute the removal order' but rather 'whether the way [the respondents] acted accords with the Constitution and the laws of this country.'"  *Torres-Jurado v. Biden*, 2023 WL 7130898, at *2 (S.D.N.Y. Oct. 29, 2023) (quoting *You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 457 (S.D.N.Y. 2018)).  "Put another way[, the r]espondents are empowered to remove [the p]etitioner at their discretion.  But they cannot do so in any manner they please." *You*, 321 F. Supp. 3d at 457.  Thus, district courts can—and do—entertain challenges to the procedural processes that the executive branch follows during the removal process.  *See, e.g.*, *id.* at 455-58 (finding jurisdiction to decide whether ICE's decision to remove a Chinese national before his motion to reopen was adjudicated would violate the INA); *Calderon v. Sessions*, 330 F. Supp. 3d 944, 956 (S.D.N.Y. 2018) (finding that petitioner's "seek[ing] consideration of his legitimate and authorized pursuit of an existing process *before* the government exercises its right to remove . . . is not a claim

of a right to remain in the United States"); *Fatty v. Nielsen*, 2018 WL 3491278, at *1-2

(W.D. Wash. July 20, 2018) (holding that section 1252(g) did not deprive court of

jurisdiction over petitioner's request for a stay of his removal pending the adjudication of

his petition for a T-Visa).

Here, Mata Velasquez argues that ICE violated the statutory framework as well

as constitutional law when it re-detained him.  That is a question that falls squarely

within this Court's habeas jurisdiction.  And for that reason, section 1252(g) does not

bar this Court's hearing Mata Velasquez's habeas petition.

### B.    Sections 1252(a)(2)(A) and 1252(e)(3)

The government also argues that section 1252(a)(2)(A) bars this Court from

reviewing "challenges relating to the Attorney General's decision to invoke expedited

removal, h[er] choice of whom to remove in this manner, h[er] procedures and policies,

and the implementation or operation of a removal order."  Docket Item 42 at 10 (citation

omitted).  And, the government argues, to the extent that Mata Velasquez challenges

the expedited removal process, "such challenges must be filed in the U.S. District Court

for the District of Columbia."  *Id.* at 9 (citing 8 U.S.C. § 1252(e)(3)(A)).

Mata Velasquez counters that because "none of the claims on which [he] seeks

preliminary relief implicate expedited removal, the jurisdictional bars at [sections]

1252(e)(3)(a) and (a)(2)(A), which solely concern expedited removal, are categorically

inapplicable."  Docket Item 54 at 5-6.  "[A]s the government has conceded," Mata

Velasquez explains, he "is not in expedited removal proceedings; he is in [s]ection 240

proceedings."  *Id.* at 5 (citing Docket Item 51).  "Nor were expedited removal

proceedings even possible at the time the government unlawfully arrested [him]," he

says, "as the government had not yet moved to dismiss his [s]ection 240 proceedings."
*Id.* Moreover, Mata Velasquez observes, section "1252(e)(3) narrowly applies only to
systemic challenges to regulations implementing expedited removal, not to
constitutional or statutory claims which precede and are collateral to that process,
including, as relevant here, unlawful arrest or detention." *Id.* at 6.

The crux of Mata Velasquez's argument with respect to expedited removal is that
the government does not have the lawful authority to initiate that process against him at
this time because of his current status. He does not challenge the statutory framework,
nor does he challenge the wisdom of the discretionary decision to place him in
expedited proceedings. Sections 1252(a)(2)(A) and 1252(e)(3) therefore do not bar this
Court from considering his petition.

### C.    Section 1252(a)(2)(B)(ii)

Finally, the government argues that "to the extent [Mata Velasquez] challenges
the revocation of his parole . . . such review by this Court is precluded under [section]
1252(a)(2)(B)(ii)." Docket Item 42 at 10; *see* 8 U.S.C. § 1252(a)(2)(B) (providing in
relevant part that "no court shall have jurisdiction to review . . . any . . . decision or
action of the Attorney General or the Secretary of Homeland Security the authority for
which is specified under this subchapter to be in the discretion of the Attorney
General or the Secretary of Homeland Security"). In support, the government relies on
a case in which the Seventh Circuit found that "[r]evocation of parole, because it is an
exercise of discretionary authority by the immigration authorities, 8 U.S.C.
§ 1182(d)(5)(A), is not judicially reviewable." Docket Item 42 at 10 (quoting *Samirah v.
Holder*, 627 F.3d 652, 656 (7th Cir. 2010)).

14

As the Second Circuit has held, however, even when a "statute strips jurisdiction over a substantive discretionary decision, [it] does not strip jurisdiction over procedural challenges."  *Mantena v. Johnson*, 809 F.3d 721, 728 (2d Cir. 2015); *see also Sharkey v. Quarantillo*, 541 F.3d 75, 86 (2d Cir. 2008) (explaining agency action "not performed in accordance with the mandatory rescission procedures" is "not specified . . . to be in the discretion of the Attorney General" (citation and internal quotation marks omitted)). In other words, while courts cannot question the discretion that is exercised, they can address the process used to exercise that discretion.

That is precisely what Mata Velasquez challenges here.  He says that before he could be re-detained, he was entitled to some procedural due process.  And even if this Court were ultimately to reject Mata Velasquez's argument about the process to which he is entitled, "[t]he proper course . . . would be to find subject matter jurisdiction and then . . . [, if appropriate, to] find that [he] had no right to the asserted procedural safeguards, and, therefore, had provided no claim upon which relief could be granted."  *See Mantena*, 809 F.3d at 729-30.  Section 1252(a)(2)(B)(ii) therefore does not bar this Court from exercising jurisdiction over Mata Velasquez's claims.

## III.    EXHAUSTION

The government next argues that "[t]o the extent [that Mata Velasquez] challenges the dismissal of his removal proceedings under INA § 240, he has failed to exhaust administrative remedies, which would obviate the need for federal court intervention, requiring dismissal of that claim."  Docket Item 42 at 11.  This Court need not linger long on this argument.  As the petitioner observes, "[t]he government does not—and cannot—explain how resolution of his BIA appeal would preclude judicial

review of his claims in this motion concerning his unlawful arrest and detention."  Docket

Item 54 at 7.  The government is correct that this Court does not have jurisdiction to

decide the question—currently pending before the BIA—of whether the IJ properly

granted the government's motion to dismiss the section 240 proceedings.  But the

questions before this Court are distinct from that question, and, therefore, the

exhaustion that the government urges would be futile.

## IV.    MATA VELASQUEZ'S LIKELIHOOD OF SUCCESS ON THE MERITS

This brings the Court to the crux of the issue: whether Mata Velasquez is lawfully

detained.  To answer that question, this Court first must explore what rights, if any, Mata

Valasquez has with respect to his arrest and detention under the relevant statutory

framework and the Due Process Clause of the Constitution.  The Court then must

examine whether the government has violated any of those rights.

### A.    Statutory Rights

There is no dispute that Mata Velasquez has the "rights . . . afforded by statute."

*See* Docket Item 42 at 19.  The parties sharply disagree, however, about the scope of

those rights.

#### 1.    The government's ability to commence expedited removal proceedings while Mata Velasquez's section 240 appeal still is pending

The government appears to argue that because it seeks to put Mata Velasquez

into expedited removal proceedings, his detention is per se lawful.  *See* Docket Item 42

at 13 (explaining that "Congress has decided that for arriving [noncitizens] subject to the

process of expedited removal, detention is mandatory" (citing 8 U.S.C.

§ 1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV))).  According to the government, "there are no statutory provisions allowing [Mata Velasquez] to challenge his detention; it is mandated by statute."  *Id.*  In other words, the government seems to be saying that regardless of Mata Velasquez's parole, if it puts him in expedited removal proceedings, it has a new basis for his detention that effectively annuls his previous grant of parole.  If Mata Velasquez is not in expedited removal proceedings, however, that argument no longer works.

Mata Velasquez argues that he is not currently in expedited removal proceedings and that he cannot be placed in expedited proceedings unless and until his BIA appeal has been decided.[4]  *See* Docket Item 54 at 5; *see also* Docket Item 44.  And at least one official at USCIS with the authority to close his case agrees with him.[5]  *See* Docket Item 51 at ¶ 10 (stating that "USCIS stated to [Mata Velasquez]'s immigration counsel that [Mata Velasquez]'s case with the agency 'has been closed due to lack of jurisdiction'").  For the reasons explained below, this Court agrees with USCIS that Mata

---

[4] There remains a question of whether the government has the authority to commence expedited removal proceedings even after the BIA rules.  *See Y-Z-L-H v. Bostock*, 2025 WL 1898025, at *11 n.101 (D. Or. July 9, 2025) (noting that the "[p]etitioner might not be eligible to be placed into [section] 1225(b)(1) expedited removal upon termination of parole"); *Doe*, 2025 WL 1099602, at *16-17 (rejecting DHS's argument that termination of parole allows for placement into expedited removal because 8 U.S.C. § 1225(b)(1) applies only to noncitizens "arriving in the United States" or who have entered unlawfully and have been present less than two years (quoting § 1225(b)(1))).  But that is a question for another day.

[5] Counsel for the government made it clear at oral argument that he disagrees with this assessment.  It is worth noting that in a similar case, however, the government appears to have conceded the point.  *See Y-Z-L-H*, 2025 WL 1898025, at *5 (noting that the "[r]espondents concede that [the p]etitioner is not currently in 'expedited removal' proceedings" and "further concede that [he] remains in removal proceedings under 8 U.S.C. § 1229a during his administrative appeal of the dismissal of his removal proceedings").

Velasquez has a statutory right protecting him from being placed in expedited removal proceedings before the BIA decides his appeal on his section 240 proceedings.

Because DHS chose to place Mata Velasquez in section 240 proceedings instead of pursuing expedited removal in the first instance—even though it was not required to do that—the government vested Mata Velasquez with the rights that Congress guaranteed non-citizens in those proceedings. *See Augustin v. Sava*, 735 F.2d 32, 36 (2d Cir. 1984) ("Although [noncitizens] who petition for admission have no constitutional rights regarding their applications, they do have such statutory rights as Congress grants." (footnote omitted)); *cf. Torres-Jurado*, 2023 WL 7130898, at *3 ("Although [d]efendants were under no obligation to grant the ICE Stay in the first place, their decision to do so triggered obligations that they cannot now ignore."). In *Augustin*, for example, the Second Circuit found that an asylum applicant "was denied procedural rights protected by statute and INS regulations . . . where the translation of the asylum application was nonsensical, the accuracy and scope of the hearing translation are subject to grave doubt, appellant misunderstood the nature and finality of the proceeding, and a credible claim which developed following translation was not reviewed." 735 F.2d at 38. And those rights include being able to appeal IJ decisions to the BIA, *see* 8 C.F.R. § 1003.38(a), and—as discussed in more detail below, *see infra* Section IV.A.2—not to have parole revoked unless a government official gives notice and makes certain findings, *see* 8 C.F.R. § 212.5(e)(2)(i); *see also* 8 U.S.C. § 1182(d)(5)(A).

Relying on the Third Circuit's decision in *Avila v. Attorney General*, 826 F.3d 662, 669 (3d Cir. 2016), the government says that "[n]othing in the statute prohibits [Mata

Velasquez] from being subject to both expedited removal and removal proceedings under INA 240/[section] 1229a." *See* Docket Item 42 at 14. But as Mata Velasquez observes, in *Avila*, the two proceedings were based on different and independent grounds for removal. *See* Docket Item 44 at 12 (citing *Avila*, 826 F.3d at 670). Thus, *Avila* does not address the situation here where a section 1229 proceeding is pending and the government wants to start an expedited removal proceeding—and to detain the noncitizen—on the same ground.

As explained above, Mata Velasquez's right to have his appeal heard by the BIA prohibits the initiation of expedited removal proceedings—and therefore mandatory detention under 8 U.S.C. § 1225(b)(1)—before his section 240 proceedings have been allowed to run their procedural course. "ICE cannot manipulate the removal proceedings in its favor by substituting expedited proceedings for immigration proceedings already in progress before the immigration court. It is an abuse of process." *Valdez v. Joyce*, 2025 WL 1707737, at *4 (S.D.N.Y. June 18, 2025).[6]

### 2.    Requirements for revocation of parole

That does not end the inquiry, however. The government also says that it has revoked Mata Velazquez's parole and that he therefore "remains detained pursuant to 8

---

[6] What is more, and as explained in more detail below, *see infra* Section IV.B.1, there is something fundamentally unfair about the government's changing the rules by fiat simply because it wants to. That is arbitrary by definition. And that is especially troubling here, where Mata Velasquez played by the first set of rules without any hint of a violation and spent his time and money accepting the government's invitation and coming here to play by those rules. Luring noncitizens here, paroling them for a period of time, and then telling them "never mind" is just plain wrong—made even worse when the noncitizens are detained while their cases are heard. And a change in administration does not justify or excuse such fundamental unfairness.

U.S.C. § 1225(b)(2)(A), as an arriving [noncitizen] detained for a proceeding under § 1229a." Docket Item 42 at 13 n.7. As the government repeatedly observes, detention generally is mandatory under section 1225(b). Therefore, the government argues, Mata Velasquez's detention still is mandatory.

But there is an exception to that rule: parole. Mata Velasquez was granted parole for two years. And the revocation of parole is governed by regulations.

"[U]nder deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020). In *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-68 (1954), for instance, the Supreme Court reversed the dismissal of a habeas petition in which the petitioner alleged that the BIA had failed to follow its own regulations. "[E]mphasiz[ing] that [it was] not . . . reviewing and reversing the manner in which discretion was exercised," the Court held that the petitioner was entitled to a hearing on "the Board's alleged failure to exercise its own discretion, contrary to existing valid regulations." *Id.* at 268. If the petitioner could prove that allegation, the Court held, he would be owed "a new hearing before the Board" under the proper procedures.[7] *Id.*; *see also Augustin*,

---

[7] It is true that not every violation of an agency's rules necessarily requires a wholesale redoing of agency action. *See Waldron v. I.N.S.*, 17 F.3d 511, 518 (2d Cir. 1993) ("[W]here an INS regulation does not affect fundamental rights derived from the Constitution or a federal statute, . . . it is best to invalidate a challenged proceeding only upon a showing of prejudice to the rights sought to be protected by the subject regulation.") But as noted above, the same is not true "when a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute." *Id.* And there can be little argument that revocation of parole, which results in detention, affects the fundamental right of liberty.

735 F.2d at 38 (holding that asylum applicant was entitled to "procedural rights protected by statute and INS regulations").

The government therefore does not have the authority to arrest a noncitizen who has been granted parole without properly terminating that parole, *see Y-Z-L-H v. Bostock*, 2025 WL 1898025, at *13 (D. Or. July 9, 2025), or unless there is some other valid reason to arrest him. The government does not claim that it had any reason to arrest Mata Velasquez other than the revocation of his parole. *See generally* Docket Item 42. So the question, then, is what is required to revoke parole? And has the government met those requirements?

As an initial matter, it appears that Mata Velasquez was arrested and detained before he was given any notice that his parole was revoked. *See* Docket Item 21 at ¶¶ 43-47 (stating the Mata Velasquez was arrested on May 21, 2025, but that it was not until May 28, 2025, that "[r]espondent Kurzdorfer, the Acting Field Office Director, issued a letter in English only . . . that terminated his parole pending the outcome of his removal proceedings").[8] At oral argument, the government was not able to provide a definitive answer about its authority to detain Mata Velasquez before his parole was revoked, except to say that that the government intended to place him in expedited removal proceedings. This Court therefore has little trouble finding that Mata Velasquez's arrest on May 21, 2025, was unlawful.

---

[8] As Mata Velasquez observes, "any suggestion that the government has complied with the parole statute and its regulations because it published [the Termination] Notice in the Federal Register . . . is plainly wrong on the law," as the regulations require "'written notice *to the [noncitizen]*' in order for a parole termination to be effective." Docket Item 62 at 10 (emphasis added) (quoting 8 C.F.R. § 212.5(e)(2)(i)).

But finding that the government violated Mata Velasquez's rights when it arrested him does not end the inquiry. After Mata Velasquez was arrested, the government at least ostensibly gave him notice of his parole revocation.[9] So the Court turns to the question of whether the manner in which the government revoked Mata Velasquez's parole violated his statutory rights.

Section 1182 provides that parole may be granted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). In other words, if a noncitizen has been granted parole, that means some DHS official with authority decided that there were either "urgent humanitarian reasons" or "significant public benefit" justifying the parole of that individual. *See id.*; 8 C.F.R. § 212.5(e)(2)(i). To revoke parole, in turn, a DHS official with authority must decide either that the "the purpose for which parole was authorized" has been "accomplish[ed]" or that "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen]" in the United States. 8 C.F.R. § 212.5(e)(2)(i).

Several courts have found that just as a grant of parole requires an individualized review, revocation of parole requires a case-by-case assessment to comply with the statute. *See Y-Z-L-H*, 2025 WL 1898025, at *7 ("Common sense suggests . . . that parole given only on a case-by-case basis is to be terminated only on such a basis." (citation omitted)); *Doe*, 2025 WL 1099602, at *18 ("The statute thus seems to

---

[9] Although Mata Velasquez did not directly raise the argument, the Court has serious doubts as to whether a letter written only in English constitutes sufficient notice to a noncitizen who cannot read English. *Cf. Augustin*, 735 F.2d at 36 (finding that asylum applicant "was denied procedural rights protected by statute and INS regulations . . . where the translation of the asylum application was nonsensical" and "the accuracy and scope of the hearing translation are subject to grave doubt").

contemplate termination of parole on an individual, rather than categorical, basis. This makes sense: Even under the categorical programs, grants of parole were to be made on a case-by-case basis."). As the *Doe* court observed, "[t]hroughout the provision, [s]ection 1182(d)(5)(A) refers in singular, rather than plural, to grants of parole":

> The Secretary of Homeland Security may . . . in h[er] discretion parole into the United States temporarily under such conditions as [s]he may prescribe only *on a case-by-case basis* for urgent humanitarian reasons or significant public benefit *any [noncitizen]* applying for admission to the United States, but *such parole of such [noncitizen]* shall not be regarded as an admission of *the [noncitizen]* and when the purposes of *such parole* shall, in the opinion of the Secretary of Homeland Security, have been served *the [noncitizen]* shall forthwith return or be returned to the custody from which *he was paroled* and thereafter *his case* shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

2025 WL 1099602, at *18 (quoting 8 U.S.C. § 1182(d)(5)(A)).

This Court agrees that both common sense and the words of the statute require parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole "must attend to the reasons an individual [noncitizen] received parole." *See id.* There is no indication in the record that the government conducted any such analysis here. On the contrary, the letter Mata Velasquez received merely stated summarily that DHS had "revoked [his] parole." Docket Item 62-1 at 5. Thus, there is no indication that—as required by the statute and regulations—an official with authority made a determination *specific to Mata Velasquez* that either "the purpose for which [his] parole was authorized" has been "accomplish[ed]" or that "neither humanitarian reasons nor public benefit warrants [his] continued presence . . . in the United States." *See* 8 C.F.R. § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's parole violated his rights under the statute and regulations. *See Y-Z-L-H*, 2025 WL 1898025, at *13.

## B.    Constitutional Rights

So the question becomes to what process—if any—is Mata Velasquez entitled before DHS can revoke his parole.  The regulations mandate "notice," 8 C.F.R. § 212.5(e)(2)(i), but neither the statute nor the regulations provide any other procedural protections, *see id.*; 8 U.S.C. § 1182(d)(5)(A).  And the government says Mata Velasquez is entitled only to the rights provided by statute.  But Mata Velasquez argues that the Due Process Clause provides him further procedural protection.

For the reasons that follow, this Court agrees with Mata Velasquez that some additional process is due.  More specifically, this Court finds that Mata Velasquez must be given "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  And because he has not yet been given any opportunity to be heard—let alone a meaningful opportunity—his detention is unlawful, and he must be released.

### 1.    Procedural due process rights for parole revocation

To begin, it is clear—as the government emphasizes—that an "arriving" noncitizen such as Mata Velasquez "has only those rights *regarding admission* that Congress has provided by statute."  *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020) (emphasis added); *see also Augustin*, 735 F.2d at 36 ("Although [noncitizens] who petition for admission have no constitutional rights *regarding their applications*, they do have such statutory rights as Congress grants." (emphasis added) (footnote omitted)).  Parole, by its explicit definition in the statute, is not admission.  *See* 8 U.S.C. § 1182 (d)(5)(A) (explaining that "such parole of [a noncitizen] shall not be

regarded as an admission of the [noncitizen]").  So an "arriving" noncitizen may have rights in connection with his parole.

That being said, the caselaw suggests that no process beyond that outlined in the statute and regulations generally is required to revoke parole.  *See Ofosu v. McElroy*, 98 F.3d 694, 700 (2d Cir. 1996) ("His parole is a matter of the Attorney General's discretion (and of the opinion of those she appoints) and may be ended without hearings or special forms."); *Wong Hing Fun v. Esperdy*, 335 F.2d 656, 657 (2d Cir. 1964) ("There is no basis for appellants' contention that due process requires a hearing on revocation of parole, even though Congress did not provide one.").  But that rule is not absolute.  And the Second Circuit illustrated that point more than half a century ago in a case with striking similarities to this one.

In *U.S. ex rel. Paktorovics v. Murff*, 260 F.2d 610 (2d Cir. 1958), the Second Circuit held that "[u]nder the special circumstances of the . . . Hungarian refugees [at issue in that case], we think their parole may not be revoked without a hearing at which the basis for the discretionary ruling of revocation may be contested on the merits."  *Id.* at 612.  There, the petitioner—Gyula Paktorovics—and his family had been "invited here pursuant to the announced foreign policy of the United States as formulated by the President in his directive of December 1, 1956."  *Id.* at 614.  Describing the case as "sui generis," the Second Circuit distinguished it from "other exclusion cases," such as *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) and *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950), which held that "[w]hatever the procedure authorized by Congress is, it is due process as far as [a noncitizen] denied

entry is concerned." *Paktorovics*, 260 F.2d at 613-14. The "invit[ation]" by the President made this case different, the court said. *See id.* at 614.

It is true "that the President has no power to change the law by inviting Paktorovics and the other Hungarian refugees to come here," the court explained, "but this is not to say that the tender of such an invitation and its acceptance by him did not effect a change in the status of Paktorovics sufficient to entitle him to the protection of our Constitution." *Id.* at 614. And "[i]f this means an extension of the doctrine that [noncitizens] as well as citizens are entitled to the protection of procedural due process in deportation proceedings so as to include within the protected class . . . parolees who have come to the United States as have the Hungarian refugees of whom appellant is merely one of thousands," the court said, "we do not hesitate to take that forward step, in view of all the circumstances of this case." *Id.* Thus, the court "h[e]ld that, in order to bring [8 U.S.C.] § 1182(d)(5), 'into harmony with the Constitution,' a hearing is required prior to the revocation of parole when this section is applied to persons situated in the United States as is appellant in the case at bar." *Id.* (footnote omitted). Were that not the case, the court explained, "any one or all of this large number of Hungarians who fled from the might of Soviet Russia must leave our shores on the mere say-so of a [g]overnment official, however unreasonable or capricious this say-so may be, and even if there is no basis whatever for such a ruling." *Id.* at 612.

"Accordingly," the court concluded, "since a construction of [section] 1182(d)(5), which requires a hearing on the subject of revocation of parole w[ould] remove serious doubt regarding the validity of the statute, [it] construe[d] the section and h[e]ld that appellant [wa]s entitled to a hearing prior to the revocation of his parole." *Id.* at 615.

The court ended with this: "We do not say that the discretion of the courts should be substituted for the discretion to be exercised by the Attorney General as provided by law. We do say that there must be a hearing which will give assurance that the discretion of the Attorney General shall be exercised against a background of facts fairly contested in the open." *Id.*

Nearly seventy years later, the government now argues to this Court that because "due process in this case [is] only what is afforded by statute, [the p]etitioner lacks any right to release . . . or any justification for his arrest other than the fact that the statute requires it." Docket Item 42 at 19. Simply put, this Court "cannot agree that such is the law." *See Paktorovics*, 260 F.2d at 612.

This Court finds that, as in *Paktorovics*, the circumstances of this case require some level of constitutional due process before parole can be revoked. Like Paktorovics, Mata Velasquez and others like him were invited here.[10] They spent their own funds to get here, and they were told that they would have two years of parole.

_____

[10] The Eleventh Circuit has distinguished *Paktorovics* from a case in involving the Mariel Cubans on the basis that "Congress [thereafter] enacted legislation endorsing the extraordinary action of the President with respect to these Hungarian refugees." *Id.* *Garcia-Mir v. Meese*, 788 F.2d 1446, 1451 n.5 (11th Cir. 1986) (quoting *Paktorovics*, 260 F.2d at 614). According to the Eleventh Circuit, "[e]ven *Paktorovics* concedes that the President alone lacks the authority to create such a liberty interest *sua sponte*." *Id.* (citing *Paktorovics*, 260 F.2d at 614). This Court disagrees with that reading. *See Paktorovics*, 260 F.2d at 614 ("True it is that the President has *no power to change the law* by inviting Paktorovics and the other Hungarian refugees to come here, but this is not to say that the tender of such an invitation and its acceptance by him did not *effect a change in the status of Paktorovics sufficient to entitle him to the protection of our Constitution*." (emphasis added)).

Nor does the Court find dispositive that in *Paktorovics*, it was "the President" who "invited Hungarian refugees to come to the United States," as opposed to DHS. *See* Docket Item 61 at 6. The point is that the government of this country—in fact, the executive branch—extended an invitation.

27

While the new administration may think that decision was flat wrong, that does not eliminate the rights of those who relied on the program instituted by the prior administration. *Cf.* Termination Notice, 90 FR 13611-01, 2025 WL 894696, at 13618-20 (outlining reliance interests of those on parole and their supporters).

Moreover, in *Paktorovics*—unlike here—there was at least some allegation of wrongdoing to justify the parole revocation. After interviewing Paktorovics several times, the government determined that he had been a member of the Communist Party and that he had not been fully truthful about that on his parole application. *Paktorovics*, 260 F.2d at 611. Here, by contrast, the government appears to concede that Mata Velasquez has done nothing wrong—except, perhaps, accepting our nation's invitation to come here in light of the possibility that a new administration might think that the invitation never should have been extended and pull the rug out from under him.

At oral argument, the government repeatedly described the decision to terminate Mata Velasquez's parole as "political." And, of course, the new administration is free to shift policies and change course. But that does not mean it can do so without complying with the law and due process. Even if the new administration thinks that the prior administration made a grave error in judgment when it instituted the parole program, it cannot trample on due process rights in order to terminate it more quickly.

Stated another way, the new administration can change the rules, but it cannot change them and make up new rules as it goes along when the new rules abridge constitutional rights. Indeed, as this Court recently stated in a somewhat different context, "while [DHS] might want to enforce this country's immigration laws efficiently, it

cannot do that at the expense of fairness and due process."  *Ceesay v. Kurzdorfer*, ---

F. Supp. 3d ---, 2025 WL 1284720, at *1 (W.D.N.Y. May 2, 2025).

The government's attempts to distinguish *Paktorovics* miss the mark.  *See*

Docket Item 61 at 6-8.  First, the government says that "[t]he Second Circuit . . . was

mindful of the President's motive in granting parole to Hungarian nationals in deciding

the case."  *Id.* at 6 (citing *Paktorovics*, 260 F.2d at 613).  "Here, by contrast," the

government contends, Mata Velasquez's "case is not unique, and President Trump has

established that parole was previously granted categorically and instead must be

decided on a case-by-case basis in accordance with the statute providing for such

parole."  *Id.*  "Thus, whereas in *Paktorovics*[,] the Second Circuit gave weight to the

President's intention to welcome Hungarian refugees," the government argues, "so too

should this Court give weight to President Trump's decision to terminate categorical

parole issued to [noncitizens] like [Mata Velasquez]."  *Id.* at 7.

As an initial matter, Mata Velasquez was not given parole categorically; on the

contrary, he was granted parole on a case-by-case basis.  As noted above, Section

1182 provides that parole may be granted "only on a case-by-case basis for urgent

humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A).  And the

program under which Mata Velasquez came to the United States gave noncitizens the

ability to "seek[], *on a case-by-case basis*, a discretionary grant of parole at an internal

port of entry."  *See Doe*, 2025 WL 1099602, at *1 (quoting Implementation of a Parole

Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022)) (emphasis added).  And

Mata Velasquez individually was granted discretionary humanitarian parole for two

years to pursue his asylum claim.  *See* Docket Item 21 at ¶ 40.  So the government is just plain wrong in its first attempt to distinguish *Paktorovics.*

What is more*,* the Termination Notice "gave no explanation or support for the conclusion that the CHNV programs were addressing relevant humanitarian concerns through something other than case-by-case determinations."  *See Doe*, 2025 WL 1099602, at *17.  But even if it had given such an explanation, focusing on the motives of the new administration misses the point.  Every administration of a new president does not write on a blank slate; on the contrary, the new administration must live with at least some of the actions of the prior administration.  *Cf. Torres-Jurado*, 2023 WL 7130898, at *4 ("[W]hen an agency changes course, it must be 'cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account,' and '[it] would be arbitrary and capricious to ignore such matters.'" (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020))).  And as Mata Velasquez observes, "while [the] new administration may wish to change course, [his] engendered reliance interest, and his compliance with everything that the Executive Branch asked of him, entitles him to more than summary arrest and detention 'on the mere say-so of a [g]overnment official.'"  Docket Item 62 at 3-4 (quoting *Paktorovics*, 260 F.2d at 612).

The government also asserts that this case is different because "[t]he court's holding [in *Paktorovics*] was based on the fact that absent a hearing on revocation of parole, the [noncitizen] in that case may have been deported without any hearing at all."  Docket Item 61 at 7 (citing *Paktorovics*, 260 F.2d at 615).  "Here," the respondents claim, "there is no such risk" because they "have been attempting to schedule an

30

interview for [Mata Velasquez] to determine whether he is entitled to claim asylum." *Id.* And "[i]f so entitled, he may be eligible for relief from removal altogether." *Id.*

First, it bears noting that Mata Velasquez is currently appealing the government's decision to *dismiss* his asylum proceedings. So the notion that he *may* have the opportunity to petition for asylum again following a CFI does not ease this Court's due process concerns. Furthermore, although it is true that the Second Circuit was concerned with the possibility that Paktorovics could be deported without a hearing, the decision was focused on the procedures required for revocation of parole. And the same fundamental fairness issues that motivated that decision apply equally here: this country cannot invite people here and then give them no process when it arbitrarily seeks to revoke that invitation. Would Mata Velasquez have come here if he knew that he might be arrested and imprisoned while his asylum case works its way through the system despite having done everything that was asked of him on parole? And regardless of the answer to that question, under these circumstances, he is entitled to some process before his parole is revoked.

The Supreme Court's decision in *Thuraissigiam* does not change the calculus. In *Thuraissigiam*, the noncitizen "did not ask to be released. Instead, he sought entirely different relief: vacatur of his 'removal order' and 'an order directing [the Department] to provide him with a new . . . opportunity to apply for asylum and other relief from removal.'" 591 U.S. at 117-18 (footnote omitted). The Supreme Court rejected the petitioner's claim that he was entitled to constitutional due process in his expedited removal proceeding.

The Court explained that the petitioner's argument "disregard[ed] the reason for our century-old rule regarding the due process rights of [a noncitizen] seeking *initial entry*." *Id.* at 139 (emphasis added). "That rule rests on fundamental propositions," the Court explained: "[T]he power to *admit or exclude* [noncitizens] is a sovereign prerogative; the Constitution gives the political department of the government plenary authority to decide which [noncitizens] to *admit*; and a concomitant of that power is the power to set the procedures to be followed in determining *whether [a noncitizen] should be admitted*." *Id.* (emphasis added) (internal citations and quotation marks omitted). The Court then explained that under the expedited removal statute, "Congress provided the right to a 'determin[ation]' whether [the noncitizen] had 'a significant possibility' of 'establish[ing] eligibility for asylum,' and he was given that right." *Id.* at 140 (citing 8 U.S.C. §§ 1225(b)(1)(B)(ii), (v)). "Because the Due Process Clause provides nothing more," the Court concluded, "it does not require review of that determination or how it was made." *Id.*

While *Thuraissigiam* forecloses the argument that Mata Velasquez has due process rights beyond those provided by statute concerning the process for deciding whether or not he will be *admitted* to this country, it does not foreclose his arguments regarding parole revocation and release.[11]  *See Padilla v. U.S. Immigr. & Customs Enf't,* 704 F. Supp. 3d 1163, 1171 (W.D. Wash. 2023) (rejecting argument that court should "extract from *Thuraissigiam* a broad rule that any inadmissible noncitizen possesses

---

[11] This Court agrees with the government that with respect to Mata Velasquez's right to *admission*, he is treated as if he had just arrived at the border.  *See Thuraissigiam*, 591 U.S. at 139 (explaining that noncitizens "who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border'").

only those due process rights afforded to them by statute, regardless of the nature of their status or the relief they seek" as "such a conclusion is untethered to the claim in *Thuraissigiam* and the Court's reasoning").[12]  And the respondents "present no cogent reason why the Court should extend this limited holding to any noncitizen within the immigration process regardless of the legal challenge presented."  *Id.* at 1172.

Indeed, as this Court previously observed in the context of prolonged detention, "[a]lthough [noncitizens] 'on the threshold of initial entry' may have fewer due process rights than other 'persons,' the government's argument—that *Mezei*'s [statement] that '[w]hatever the procedure authorized by Congress is due process as far as [a noncitizen] denied entry is concerned,' is to be taken literally—cannot be correct." *Clerveaux v. Searls*, 397 F. Supp. 3d 299, 316 (W.D.N.Y. 2019) (internal citations omitted); *see also Birch v. Decker*, 2018 WL 794618, at *6 (S.D.N.Y. Feb. 7, 2018) ("As a threshold matter, it is clear that [noncitizens] detained on U.S. soil, regardless of whether they have been formally 'admitted' under [8 U.S.C.] § 1101(a)(13)(A), are entitled to *some* due process protection.  That protection is undoubtedly diminished— both vis-à-vis citizens and immigrants who have effected an entry (legally or illegally)— but it nonetheless exists in some form." (emphasis added)).  Were it true that "arriving" noncitizens have *no* due process rights, it would mean that such individuals—including

---

[12] This Court recognizes that another court in this district has read *Thuraissigiam* as foreclosing a due process argument concerning detention.  *See Gonzales Garcia v. Rosen*, 513 F. Supp. 3d 329, 334 (W.D.N.Y. 2021) (Wolford, J.) (rejecting argument "that *Thuraissigiam* does not apply to challenges to detention, but is limited to the claims of individuals challenging admission decisions").  "While *Thuraissigiam* was decided in the admission context," Judge Wolford explained, "it cited and reaffirmed the continuing vitality of *Mezei*, which addressed the issue of detention."  *Id.*  But *Gonzales Garcia* did not concern parole revocation.  And because *Paktorovics* distinguished *Mezei*, *Thuraissigiam* does not preclude this Court from following *Paktorovics* here.

those living freely among us on parole—could "be subjected to the punishment of hard labor without a judicial trial." *Clerveaux*, 397 F. Supp. 3d at 316 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 704 (2001) (Scalia, J., dissenting)).  And it would mean that a noncitizen living here on parole could be taken into custody and beaten by local police without any violation of the Fourth Amendment.  That cannot be the law.

Moreover, *Thuraissigiam* relies on *Mezei* for the proposition that noncitizens "who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'"  591 U.S. at 139 (quoting *Mezei*, 345 U.S. at 215).  As explained above, however, *Paktorovics* distinguished *Mezei* because the petitioner and his family had been "invited here pursuant to the announced foreign policy of the United States."  260 F.2d at 613-14.  So, too, was Mata Velasquez invited here—which was not the case for the petitioner in *Thuraissigiam*.  Thus, nothing in *Thuraissigiam* overrules *Paktorovics*.

### 2.    *Mathews v. Eldridge* analysis

Having found that *some* constitutional due process is required before parole can be revoked in this circumstance, the question becomes what level of process?  And the answer to that question is governed by the balancing test outlined in *Mathews v. Eldridge*, 424 U.S. 319 (1976).[13]

As the Court in *Mathews* explained, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

---

[13] Because *Paktorovics* was decided prior to *Mathews*, it did not employ the applicable balancing test in determining whether a hearing was required.

"[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors": (1) "the private interest that will be affected by the official action"; (2) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," and (3) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Id.* at 335.

This Court agrees with Mata Velasquez that "[t]he first *Mathews* factor weighs heavily in [his] favor." Docket Item 23 at 13. As this Court has previously and repeatedly observed, a noncitizen's "interest in his freedom pending the conclusion of his removal proceedings deserves great 'weight and gravity.'" *Clerveaux*, 397 F. Supp. 3d at 309 (quoting *Addington v. Texas*, 441 U.S. 418, 427 (1979)). Indeed, "the interest in being free from imprisonment" is "the most significant liberty interest there is." *Black v. Decker*, 103 F.4th 133, 151 (2d Cir. 2024) (quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020)); *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("We have always been careful not to minimize the importance and fundamental nature of the individual's right to liberty." (citation and internal quotation marks omitted)). And that is especially so here where Mata Velasquez followed all the rules and "[t]he deprivation that [he] experienced was not the result of a criminal adjudication," *see Velasco Lopez*, 978 F.3d at 851, or even the suggestion that he did anything that was wrong in any way.

The government has weighty interests as well. "First, because [Mata Velasquez] was paroled into the country without authority to enter, his release into the United States

would implicate the authority of the government to manage who may enter the country."
*Clerveaux*, 397 F. Supp. 3d at 310.  The government also "has an interest in detaining
[noncitizens] 'to ensure that [they] will be available if [they are] determined to be
deportable'" and "in efficient administration of the immigration laws at the border."
*Rodriguez-Figueroa v. Barr*, 442 F. Supp. 3d 549, 564 (W.D.N.Y. 2020) (first quoting
*Doherty v. Thornburgh*, 943 F.2d 204, 211 (2d Cir. 1991), and then quoting *Landon v.
Plasencia*, 459 U.S. 21, 34 (1982)).  And "it must weigh heavily in the balance that
control over matters of immigration is a sovereign prerogative, largely within the control
of the executive and the legislature."  *Landon*, 459 U.S. at 34.  Additionally, the
government has an interest in the "fiscal and administrative burdens that the additional
or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at 335.  There is
no question that all of these are strong interests, and the Court treats them as such.

   The Court then turns to the risk of erroneous deprivation without additional
procedures, and the Court finds that the risk is indeed high.  DHS has announced that it
intends to revoke parole for everyone like Mata Velasquez without any regard for
individual circumstances.  *See* Termination Notice, 90 FR 13611-01, 2025 WL 894696,
at 13612.  Thus, "any attempt to secure release through ICE's limited parole procedures
would be futile."  *See* Docket Item 62 at 5.  To mitigate the risk of erroneous deprivation,
due process requires, "at [a] minimum, the opportunity for [Mata Velasquez] to submit
evidence relevant to whether [the government] should revoke [his parole] before [it]
make[s] a revocation decision."  *See Torres-Jurado*, 2023 WL 7130898, at *4.  And
although "procedural requirements can seem like a mere formality, they promote
'agency accountability' and ensure that the parties—and where relevant, the public—

can respond fully and in a timely manner to an agency's exercise of authority." *Id.* (quoting *Regents*, 591 U.S. at 22-23).

Despite the government's previous finding to the contrary, it has not provided "a reasoned explanation or any changed circumstances," *see Y-Z-L-H*, 2025 WL 1898025, at *13, that would support a decision that "neither humanitarian reasons nor public benefit warrants [Mata Velasquez's] continued presence . . . in the United States," *see* 8 C.F.R. § 212.5(e)(2)(i).[14]  Nor has Mata Velasquez been given any opportunity to be heard, let alone a meaningful opportunity.  His detention therefore violates due process, and he is likely to succeed on the merits of his claim.  *Cf. Torres-Jurado*, 2023 WL 7130898, at *4 (finding that revocation of ICE stay violated due process when agency did not "provide[ the p]laintiff with an explanation why the ICE [s]tay had been annulled nor an opportunity to provide any facts relevant to their decision to revoke the ICE [s]tay").

## V.   IRREPARABLE HARM AND BALANCE OF THE EQUITIES

Having found that Mata Velasquez is likely to succeed on the merits of his claim, this Court easily finds that the other two prongs of preliminary injunction test are met.  First, there is no question that unlawful detention causes irreparable harm, and the government's argument to the contrary is deeply troubling.  *See* Docket Item 42 at 23 (arguing that Mata Velasquez "fails to realize that his purported deprivation of liberty is a part of the immigration process for arriving [noncitizens] without authorization to enter

---

[14] As Mata Velasquez is still in section 240 proceedings, it is hard to see how the government could say that "the purpose for which parole was authorized" has been "accomplish[ed]."  *See* 8 C.F.R. § 212.5(e)(2)(i).

the United States"). Certainly, the government's statement that detention is mandatory is relevant to its argument on the likelihood of success on the merits. But for the government to argue that *anyone*'s detention—let alone someone who has never been incarcerated, who came here in response to an invitation and was promised two years of parole, and who has followed all the rules—does not cause irreparable harm deeply troubles this Court.

Likewise, there is little question that the balance of the equities and the public interest favors granting an injunction. Mata Velasquez followed all the rules. On the other hand, the government changed the rules by fiat, applied them retroactively, and pulled the rug out from under Mata Velasquez and many like him who tried to do things the right way. Moreover, every day that Mata Velasquez is detained harms him. And while it will of course be an added burden to the government to provide a meaningful opportunity to be heard, this Court finds that burden to be minimal given the magnitude of what the executive branch seeks to do with parolees like Mata Velasquez.[15]

\* \* \*

In sum, Mata Velasquez is likely to succeed on the merits of his claim that his detention violates his right to due process, his continued detention irreparably harms him every minute he is detained, and the balance of the equities tips decidedly in his favor. He therefore must be released, and the respondents may not re-detain him

---

[15] Because this Court grants release on this basis, it need not and does not reach Mata Velasquez's remaining arguments, including those regarding the legality of courthouse arrests.

unless and until they have demonstrated that they have given him a meaningful opportunity to be heard.[16]

## **CONCLUSION**

For the reasons explained above, Mata Velasquez's motion for a preliminary injunction, Docket Item 23, is GRANTED.  Within 24 hours of the issuance of this order, Mata Velasquez must be released.  The respondents are ENJOINED from re-detaining Mata Velasquez without leave of this Court, which the Court will grant only if and when the respondents demonstrate that they have complied with this order and provided Mata Velasquez with the process he is due.[17]

---

[16] Mata Velasquez says he is entitled to "a prompt hearing in which the government must show a material change in circumstances specific to [him]."  Docket Item 23 at 15.  "In this hearing," Mata Velasquez says, he "must have the opportunity to rebut the government's showing, and a neutral decision maker must have the ability to order a return to the status quo."  *Id.*; *see Valdez*, 2025 WL 1707737, at *3-4 (finding that "ongoing detention of [the p]etitioner"—who had previously been "released . . . on his own recognizance"—"with no process at all, much less prior notice, no showing of changed circumstances, or an opportunity to respond, violates his due process rights"); *Lopez v. Sessions*, 2018 WL 2932726, at *12 (S.D.N.Y. June 12, 2018) (finding that "re-detention [of noncitizen who arrived as a minor but subsequently reached the age of majority], without prior notice, a showing of changed circumstances, or a meaningful opportunity to respond, does not satisfy the procedural requirements of the Fifth Amendment").  As noted above, at this point, Mata Velasquez has been provided with no opportunity to be heard whatsoever.  Mindful of its limitations, this Court declines to weigh in on the type of process that must be provided.  Suffice it to say that he must be given some meaningful opportunity to be heard.  The Court will revisit the required details if that becomes necessary.

[17] Along with its response to the motion for a preliminary injunction, the government also moved to dismiss the amended petition.  *See* Docket Item 42.  To the extent that the government's motion to dismiss pertains to Mata Velasquez's procedural due process claim, it is denied.  The Court will schedule a status conference to discuss the status of the remaining claims in the petition.

SO ORDERED.

Dated:   July 16, 2025
         Buffalo, New York


                                         */s/ Lawrence J. Vilardo*
                                         LAWRENCE J. VILARDO
                                         UNITED STATES DISTRICT JUDGE